BOARD OF EDUCATION OF PEARL CITY COMMUNITY UNIT SCHOOL DISTRICT NO. 200, Plaintiff-Appellant, *v.* REGIONAL BOARD OF SCHOOL TRUSTEES OF STEPHENSON COUNTY *et al.*, Defendants-Appellees.

Second District    No. 80-795

Opinion filed July 23, 1981.

John A. Relias, of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellant.

William E. Sisler, State's Attorney, and Woodruff A. Burt, both of Freeport, and Marilyn F. Longwell, of Kerr and Longwell, of Chicago, for appellees.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

This is an appeal from a judgment of the Circuit Court of Stephenson County which affirmed an order by the Regional Board of School Trustees of Stephenson County granting the detachment of certain territory from the Pearl City Community Unit School District and annexing it to the Freeport Unit School District.

On December 19, 1979, a petition seeking the detachment and annexation of certain territory within Pearl City Community Unit School District No. 200 was filed with the Regional Board of School Trustees of Stephenson County. The petition, which contained a legal description of the property to be detached and the requisite number of signatures, was filed on behalf of six individuals (defendants herein) who occupied the only three residences in the 200-acre territory.

The trial court found that the major impetus behind the petition came from Bruce and Kathryn Helm, who at that time had one child in second grade attending the Pearl City Elementary School, and a set of twins who would be attending kindergarten in September 1980. These were the only children involved in the detachment. The other petitioners apparently signed mainly as a personal favor to the Helms. Their participation was necessary because the Board had turned down a similar petition involving only five acres in 1977. It is clear from the record that if the Board were going to annex at all, it would want to annex this entire area since it formed a pocket, almost an island, and annexation to the Freeport school district would help straighten the district boundaries. The reason given by the Regional Board for the detachment and annexation was "that it was in the best educational interest of the children involved."

Copies of the petition, the notice of public hearing, and a map showing the territory affected by the proposed boundary change were sent to the Pearl City and Freeport school boards, in addition to the Regional Board. However, a report concerning the financial and educational conditions of the two school districts, rather than being prepared in writing and mailed in advance of the hearing to the school boards as required by statute, was instead presented at the hearing itself.

The Regional Board held a hearing on the petition, following publication of the requisite notices, on January 21, 1980. The individual petitioners, representatives from the Pearl City and Freeport school systems, and local citizens addressed the Regional Board. The Helms testified to

their belief that the Freeport district offered better educational opportunities and a more diverse academic program for their children. Mrs. Helm stated that the family resided 3.7 miles from Freeport compared to 6.1 miles from Pearl City. She said she and her husband both graduated from large high schools and considered Freeport their home, that they actively participated in the Freeport community, and that they belonged to many organizations there. She further testified that her husband's work was in Freeport, and she herself had taught in the Carl Sandburg School in the Freeport system. She felt strongly that her twins should be placed in separate classes because most experts believe this is better for their development. The Pearl City school system, with only 613 students, in her opinion could not accommodate them in this respect, while the Freeport school system, with 6,322 students, could.

Mrs. Helm also indicated her concern as to whether the Pearl City district offered the curriculum for the educational and academic goals which the Helms had for their children. She said that the Pearl City schools had a vocational curriculum which was oriented around its agricultural constituency. She stated that she was concerned about the breadth of Pearl City's precollege curriculum, and pointed out that in Freeport there was an accelerated math program beginning in the seventh grade which would enable a student to take geometry and calculus at a college level and earn college credit. She believed that Brian, the second grader, had already shown promise and was ready for advanced math courses. She stated his SRA math test in April of 1979 was in the 99th percentile.

Mrs. Helm further testified that the family was interested in encouraging Brian's considerable interest in art and his talent in that area. For this reason they paid out-of-district tuition so that Brian could attend summer school art classes in Freeport. In her opinion, Pearl City's art room facilities were deficient.

Mrs. Helm was also concerned about the absence of any drama class at the Pearl City High School and pointed to the outstanding musicals and plays that were presented by the Freeport schools each year and her personal acquaintance with performers who had gone on to star in college productions elsewhere. She noted the absence of debate class and debate team at Pearl City, while both were available at Freeport. She criticized the Pearl City music program, pointed to the advanced science program in Freeport which enabled participants to take an extra year of high school science, and discussed the deficiency in the foreign language program in the Pearl City schools which, according to her, only offered two years of French. She stated Freeport offered five years of French, Spanish, Latin and German.

She noted the high rate of teacher turnover in the Pearl City schools

(34%) compared with the very low turnover in the Freeport system (9%). She also cited a newspaper study of Pearl City graduates for the years 1973, 1974 and 1975 showing that 82 per cent of the graduates remained in the immediate Pearl City area with only 29 per cent completing at least two years of education beyond high school, and only 4.4 per cent completing a degree program. She compared this with Freeport which sent between 50 and 55 per cent of its graduates to college, with half of that number receiving bachelor degrees. In other words, 25 to 30 per cent of Freeport graduates received college degrees compared to 4.4 per cent of the Pearl City graduates. She testified that Freeport had five National Merit semifinal students in the past two years and students from Freeport High School had been accepted at Northwestern, Brown, Yale, University of Chicago, MIT and Harvard. She claimed that none of these students could have met admission standards had they not had the advantage of Freeport's accelerated program.

In her testimony before the Regional Board, Mrs. Helm demonstrated no malice, ill will or personal grievance towards the Pearl City school system. She stated that it was not her intention to downgrade the system, but that it was her belief and that of her husband that the opportunities for their children to obtain their career objectives would be best accommodated by a larger school which offered advanced math, advanced science and foreign language courses.

Mr. Purple, the superintendent of the Pearl City system, and others testified against the detachment petition. As the trial court found, their testimony showed a group of competent and dedicated individuals who were providing programs and curricula as diverse as possible within the constraints of a small school system. There was an impressive defense of the academic and educational opportunities in the Pearl City system, and some cogent observations about the advantages to students of studying in a smaller system. In particular, the dropout rate of less than three percent at the high school level was noted.

Not only participants in the Pearl City school system, but also many of the constituents of the district spoke at the hearing with pride in their educational program. Some of the witnesses referred to children who had graduated from the Pearl City schools and excelled in academics at various colleges and universities.

In sum, the testimony showed that although the orientation of the Pearl City system leaned distinctly toward the agricultural and vocational areas, the schools have a good basic general academic and extracurricular program.

The trial court found that the difference in real estate taxes between the annexing and losing districts, $34, was not a factor. Furthermore, although evidence presented at the hearing suggested that the Pearl City

district stood to lose as much as $7,000 in tax revenues if the annexation was granted, other evidence showed that increased State aid in compensation for the drop in assessed valuation of property in the district would reduce the anticipated loss to a few hundred dollars per year.

At a meeting three weeks subsequent to the hearing, the Regional Board voted 5-1 in favor of granting the petition for detachment and annexation.

■■ In its first assignment of error, Pearl City school district contends that the decision of the Regional Board should be reversed because of procedural irregularities. Specific attention is called to section 7—6 of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 7—6), which requires that a written report of the financial and educational conditions of the affected school districts be submitted by the petitioners, in advance of a hearing, to the school boards and Regional Board. No advance written report was submitted here, but the record does reveal that such a report was attached to and made part of the record of proceedings at the public hearing, and that the financial and educational conditions of the school districts were fully discussed by the participants. No objection was made concerning the prior absence of a written report, nor was there a request for a continuance for further preparation or consideration. The objection here thus appears to be a technical rather than a substantive one, and since there was substantial compliance with the rule, we find that the absence of this written report did not invalidate the proceedings. (*Panhandle Community Unit School District No. 2 v. Goebel* (1968), 94 Ill. App. 2d 462, 238 N.E.2d 209.) Moreover, plaintiff has made no suggestion that it would otherwise have presented its views to the Board had the report been filed properly, and has therefore failed to demonstrate prejudice. *Savanna Community High School District No. 200 v. County Board of School Trustees* (1966), 73 Ill. App. 2d 202, 218 N.E.2d 811.

As its second ground of appeal, plaintiff contends that the Regional Board improperly made its decision on the basis of petitioner Helm's personal desires alone, ignoring the interests of the Pearl City school district. We disagree.

■■ In the recent case of *Board of Education v. Regional Board of School Trustees* (1980), 84 Ill. App. 3d 501, 405 N.E.2d 495, this court reviewed the factors to be considered in granting petitions to alter school district boundaries. Following *Oakdale Community Consolidated School District No. 1 v. County Board of School Trustees* (1957), 12 Ill. 2d 190, 145 N.E.2d 736, the court applied a "benefit-detriment" test, whereby a petition to detach and annex property would be granted only where the benefit derived by annexing clearly outweighed the detriment resulting to the losing district and the surrounding community as a whole. In making this determination, the court deemed it proper to consider such factors as

how the decision would affect the educational facilities of the competing districts, the ability of either district to meet prescribed state educational standards or to raise tax revenue, the comparative distances from petitioners' homes to schools in the two districts and the identity of the petitioning property with the district to which annexation is sought, the likelihood of parent and child participation in school activities, and the personal desires and convenience of the petitioning parents and their children. 84 Ill. App. 3d 501, 504, 405 N.E.2d 495, 597-98; *Bowman v. County Board of School Trustees* (1974), 16 Ill. App. 3d 1082, 1085, 307 N.E.2d 419, 421.

■■ In *McHenry County*, the petition was based solely upon the anticipated benefit annexation would bring to a single family whose high-school-aged son, a nationally ranked tennis player, would thereby be able to participate in a school tennis program which the other school district lacked. This court observed:

> "We have previously held that a change in a school boundary may properly be granted where the detachment and annexation will effectuate an educational improvement in the area. [Citation.] If all other relevant factors are the same, we find this reasoning no less persuasive when applied to a single student residing in the annexed territory. Where, as in this case, disconnection from one district and attachment to another will neither benefit or damage the schools or the community or their pupils generally, the educational welfare of an individual student affected may well be determinative of whether or not to grant such a petition." 84 Ill. App. 3d 501, 505, 405 N.E.2d 495, 498.

The similarities between *McHenry County* and our case are compelling. There, as here, the petitioning territory was located on a boundary between two school districts. The record in the present case reflects the concern of the Regional Board that the district boundary lines be regularized, a result facilitated by its decision granting the annexation.

Second, in *McHenry County*, as here, the petitioners identified socially and professionally with the annexing community. Moreover, the Helms live a few miles closer to Freeport than to Pearl City, and Mr. Helm drives to work in Freeport on a daily basis. He testified that it would present no additional burden to drive his children home if they stayed after school to participate in extracurricular activities. Although not necessarily of controlling importance, the relationship between the school district community and the parents and school children in the petitioning territory is nonetheless significant. The nexus between this factor and the educational welfare of the district as a whole is illustrated in *Burnidge v. County Board of School Trustees* (1960), 25 Ill. App. 2d 503, 509-10, 167 N.E.2d 21, 24:

"* * * an identification with a school district in a child's natural community center will inevitably result in increased participation in school activities by the child and his parents. Such increased participation cannot but result in an improvement in the educational picture of the entire area. By the same token, an unnatural identification with a school district would have an opposite result with a corresponding loss of participation and resulting poorer educational picture."

See also *Hampleman v. County Board of School Trustees* (1966), 75 Ill. App. 2d 431, 220 N.E.2d 753; *Wheeler v. County Board of School Trustees* (1965), 62 Ill. App. 2d 467, 210 N.E.2d 609.

Third, the evidence clearly supports defendants' claim that their interest in advanced math, science, and foreign language courses—the college preparatory curriculum—for their children would be better served by the school system in Freeport than by the commendable, but more limited program at Pearl City. It is true, as plaintiffs argue, that many of the benefits of the more specialized Freeport educational system would not begin to be realized by the children here until the seventh grade, and that future expectancy alone may be too speculative a basis upon which to grant an annexation petition. (*Trico Community Unit School District v. County Board of School Trustees* (1956), 8 Ill. App. 2d 494, 131 N.E.2d 829.) Of more immediate concern to the Helms, however, was the demonstrated interest of one of their children in the superior art program available at the Freeport schools, and the Helms' concern in seeing that their twin daughters are placed in separate classes. The evidence suggested that neither of these interests could presently be accommodated by the Pearl City district.

Nor was it shown that granting the petition would work a hardship upon the students or schools of the district from which the property would be detached, beyond a *de minimis* loss in tax revenues. Because some loss of revenue results in almost every detachment case, in order to be used as a basis for denying a petition there must be a showing that a serious depletion in tax resources would result. (*Cf. Bowman*, 16 Ill. App. 3d 1082, 1086, 307 N.E.2d 419, 422 (loss of ½ of 1% of territory's assessed value was "minimal"); *Oakdale*, 12 Ill. 2d 190, 194, 145 N.E.2d 736, 737 (loss of 10-20% constitutes a "serious depletion").) Here, less than 1.10 of 1 percent of the assessed property in the losing district is involved. Furthermore, there is nothing in the evidence to suggest that the detachment will affect the educational accreditation of the school.

■■ In conclusion, the record discloses that the benefit and detriment to the respective school districts was fully considered by the Regional Board, and by the Circuit Court of Stephenson County on review. As in *McHenry County*, the evidence shows that while detachment from the

Pearl City school district and attachment to the Freeport district will neither benefit nor damage the schools or communities significantly, the educational benefit to the Helm's children from this change may well be considerable. In reviewing an administrative decision, the duty of the appellate court is to ascertain whether the decision of the administrative agency is against the manifest weight of the evidence. Neither the appellate court, nor the trial court may substitute its judgment for that of the administrative agency. (*Allender v. City of Chicago Zoning Board of Appeals* (1978), 63 Ill. App. 3d 204, 381 N.E.2d 4.) The decisions of the Regional Board and the Circuit Court of Stephenson County here are amply supported by the evidence. Accordingly, we affirm the judgment of the Circuit Court of Stephenson County.

Affirmed.

NASH and HOPF, JJ., concur.